MILLENCO L.P., Plaintiff,

v.

meVC DRAPER FISHER JURVETSON FUND I, INC., John M. Grillos, Larry J. Gerhard, Harold E. Hughes, Jr., and Chauncey F. Lufkin, Defendants.

No. Civ.A. 19523.

Court of Chancery of Delaware.

Submitted Dec. 2, 2002.
Decided Dec. 19, 2002.

Joseph A. Rosenthal, Carmella P. Keener, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, and Richard W. Cohen, David C. Harrison, Michelle Rego, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, New York, for Plaintiff.

Martin P. Tully, David J. Teklits, Thomas W. Briggs, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, and Jonathan L. Greenblatt, Neil H. Koslowe, Sherman & Sterling, Washington, D.C., for Defendants.

## OPINION AND ORDER

LAMB, Vice Chancellor.

### I.

The plaintiff in this action is Millenco L.P., a privately owned company engaged in the business of investing for profit. Millenco is the largest stockholder of the defendant meVC Draper Fisher Jurvetson Fund I, Inc. (the "Fund"), owning over 6.3% of the Fund shares, purchased on the open market for a total purchase price of more than $10 million. Millenco has owned those shares continuously since before the record date of the Fund's 2001 Annual Meeting of Stockholders ("2001 Annual Meeting").

The Fund is a Delaware corporation organized as a closed-end mutual fund that has elected to be treated as a business development company under Section 54 the Investment Company Act of 1940, 15 U.S.C. § 80a, *et seq.* (the "1940 Act"). The Fund's stated investment objective is long-term capital appreciation from venture capital investments in information technology companies. In March 2000, the Fund conducted an initial public offering of its stock at $20 per share, realizing $311,650,000 of net proceeds. As of August 30, 2001, the closing price of the Fund's stock on the New York Stock Exchange had declined to $7.85 per share and the Fund's net asset value had declined to $12.35 per share.

The other defendants in this action are Larry J. Gerhard, Harold E. Hughes, Jr., Chauncey F. Lufkin and John Grillos, who are the current members of the Fund's board of directors. Before the IPO, the founders of the Fund appointed a five-member board of directors, consisting of the four individual defendants and Peter S. Freudenthal. Two of the five directors were representatives of the two Fund advisers: Freudenthal was a principal of MeVC Advisers, Inc. ("meVC Advisers") and defendant Grillos is a principal of Draper Fisher Jurvetson MeVC Management Co., LLC ("Draper Advisers"). Freudenthal was the Fund's President un-

til he resigned in June 2002. Grillos has, at all times relevant to the complaint, been the Fund's CEO. Section 56(a) of the 1940 Act requires that a majority of the Fund's directors be independent. Gerhard, Hughes, and Lufkin were appointed to serve as the Fund's independent, disinterested directors. These three disinterested directors also comprised the Fund's three-member Audit Committee.

The directors' terms of office were staggered, with Freudenthal and Grillos designated to stand for reelection to three-year terms in 2001, Gerhard in 2002, and Hughes and Lufkin in 2003. Freudenthal and Grillos were reelected at the Fund's 2001 Annual Meeting. Gerhard was re-elected in 2002.

## II.

This action was begun on April 3, 2002. In the second amended complaint, Millenco seeks, among other things, to invalidate the elections of directors at the 2001 and 2002 Annual Meetings on grounds that the proxy solicitations conducted in connection therewith were materially false and misleading. At the heart of this claim lies the Fund's failure to disclose the existence of certain relationships between and among Grillos, an inside director, and Gerhard and Hughes, two nominally independent directors. These relationships arise out of the involvement of all three (i.e., Grillos, Gerhard and Hughes) in an enterprise known as eVineyard, Inc. Millenco contends that full and accurate disclosure of the nature of those relationships was necessary for Fund stockholders to make an informed judgment about the "independence" of both Gerhard and Hughes.

### A. Grillos's Involvement in eVineyard

The business relationship of Grillos and Gerhard goes back for some years to a time when Grillos hired Gerhard as CEO of a company known as Test Systems Strategy, Inc. In 1999, Gerhard solicited Grillos to be an initial investor in eVineyard. Eventually, Grillos invested $256,000 personally, another $1,474,000 through iTech which Grillos managed as a principal, as well as additional sums as a limited partner in Osprey Ventures which invested approximately $1,500,000 in eVineyard.

In May 1999, Grillos was named to the eVineyard board of directors and also appointed as both Chairman of the Board and Chairman of the Compensation Committee. Pursuant to the eVineyard by-laws, the Chairman of the Board is an executive officer of the corporation. Moreover, Section 3.4 of those by-laws provides that "if the chief executive officer [i.e. Gerhard] is not also the chairman of the board, then the chief executive officer [Gerhard] shall report to the chairman of the board [i.e. Grillos]." Grillos continued to serve in these roles through November 6, 2001, when he resigned as Chairman of the Board, and January 28, 2002, when he resigned as a director and as Chairman of the Compensation Committee, but retained board visitation rights. While he was Chairman of the Board and Chairman of the Compensation Committee, eVineyard entered into a revised employment agreement with Gerhard. Grillos testified that he "took the lead" in terms of negotiating this contract with Gerhard.

Gerhard is a director of eVineyard and served as its CEO at all relevant times. Hughes is also a director of eVineyard and, for a time in 2001, served as COO /President. They are both substantial eVineyard stockholders.

### B. Grillos and Gerhard Propose a Fund Investment in eVineyard

On November 7, 2001, the day after Grillos's resignation as Chairman of eVine-

yard, Grillos and Gerhard proposed a transaction that Paul Wozniak, a principal of MeVC Advisers and CFO of the Fund, described as one in which "the [F]und would wind up owning eVineyard stock in a deal that essentially boils down to a straight purchase of eVineyard stock [for $1 million] despite the machinations created to make it look otherwise."[1] Wozniak also noted: "Even if this transaction proves technically legal (which is questionable at this juncture), the appearance of conflict is so great that we at meVC advisors do not wish for this deal to move forward."[2]

## C. *2001 Proxy and Election*

In 2001, Grillos and Freudenthal were up for reelection to the Board at the annual shareholders meeting. On March 1, 2001, the Fund filed a proxy statement with the SEC that included the Board's recommendation for the reelection of these two directors. The proxy statement disclosed Grillos's and Freudenthal's status as "interested persons" of the Fund due to their affiliation with the Fund's investment advisers. It also disclosed that Gerhard, Hughes and Lufkin were the Fund's "disinterested" directors. Grillos's biography included a description of his positions with the Fund and its sub-adviser and certain other positions he had held or was holding at the time. It did not disclose his positions with or investment in eVineyard or his relationships with Gerhard and Hughes. Grillos and Freudenthal ran

unopposed and on April 21, 2001 were reelected to three-year terms.

## D. *2002 Proxy and Election*

On February 25, 2002, the Fund filed with the SEC the proxy statement for the 2002 annual shareholders meeting. The proxy included two Board-recommended proposals for shareholder approval: (i) new advisory agreements with the Fund's investment adviser and sub-adviser,[3] and (ii) Gerhard's reelection to the Board. The proxy statement disclosed that Gerhard was not an "interested" person of the Fund. His biography included his position as Chairman of the Board of eVineyard (having succeeded Grillos), as well as his prior positions as President and CEO of that company. It did not, however, disclose Grillos's relationship to eVineyard. Gerhard ran unopposed and was reelected.

Millenco opposed the ratification of the new advisory agreements and successfully conducted a campaign to defeat them.

## III.

The parties have cross-moved for summary judgment on Millenco's claim seeking to invalidate the 2001 and 2002 elections of directors on grounds of breach of the directors' duty of disclosure.[4] Pursuant to Court of Chancery Rule 56, summary judgment should be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[5] In deciding

---

1. Keener Aff. Ex. 22.

2. *Id.*

3. After the Fund's inception, meVC Advisers became the investment adviser to the Fund. Freudenthal was president, CEO and chairman of the board of directors of meVC Advisers. Additionally, Draper Advisers became the sub-adviser to the Fund. Grillos is the managing member and a 35% shareholder in Draper Advisers.

4. The defendants have also moved with respect to two other aspects of the complaint. Millenco's only response to this portion of the defendants' brief is to state as follows: "Quite simply, neither of these claims is at issue in this case."

5. *See Williams v. Geier,* 671 A.2d 1368, 1375 (Del.1996).

a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party, and the moving party has the burden of demonstrating that no material question of fact exists.[6] "When a moving party has properly supported its motion, however, the non-moving party must submit admissible evidence sufficient to generate a factual issue for trial or suffer an adverse judgment."[7] Although the parties have crossed-moved for summary judgment, that fact "does not act *per se* as a concession that there is an absence of a factual issue."[8] Here, there are no material issues of fact in dispute and the cross-motions present purely questions of law.

It is undisputed that no information relating to Grillos's association with eVineyard, Gerhard and Hughes was ever disclosed to the Fund's shareholders. Instead, the Fund's proxy statements have both disclosed that Gerhard, Hughes and Lufkin are "Independent Directors" who are not "interested persons" within the meaning of the 1940 Act. While the 2002 proxy statement discloses that Gerhard and Hughes are both affiliated with eVineyard, it does not disclose Grillos's past or current relationships with that company.

 Millenco makes a plain and powerful argument that the omitted information about the Grillos/eVineyard connection was material. First, under Delaware law, the fiduciary duties of directors require that they disclose fully and with complete candor all material facts when they solicit proxies from stockholders.[9] Second, that duty is "best discharged through a broad rather than a restrictive approach to disclosure,"[10] and mere technical compliance with a statutory mandate or relevant regulations does not create a safe harbor from liability for deceptive disclosures or material omissions.[11] Third, "[a]n omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote."[12] Finally, where, as here, the omitted information goes to the independence or disinterest of directors who are identified as the company's "independent" or "not interested" directors, the "relevant inquiry is not whether an actual conflict of interest exists, but rather whether full disclosure of potential conflicts of interest has been made."[13] Applied to the facts presented, Millenco argues that the failure of either proxy statement to disclose or describe Grillos's relationship to eVineyard renders the proxy statements materially misleading and incomplete. A fund stockholder, Millenco suggests, would certainly have regarded the omitted information material in deciding how to vote on the election of directors in both 2001 and 2002.

The defendants make two arguments to avoid the result urged by Millenco. First, they argue that because the directors do

---

6. *See Tanzer v. Int'l General Indus., Inc.*, 402 A.2d 382, 385 (Del.Ch.1979) (citing *Judah v. Delaware Trust Co.*, 378 A.2d 624, 632 (Del. 1977)).

7. *Id.;* Ch. Ct. R. 56(e).

8. *United Vanguard Fund, Inc. v. Takecare, Inc.*, 693 A.2d 1076, 1079 (Del.1997).

9. *Arnold v. Society for Savings Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del.1994).

10. *Zirn v. VLI Corp.*, 621 A.2d 773, 779 (Del. 1993).

11. *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del.1977).

12. *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del.1985).

13. *Wilson v. Great American Industries, Inc.*, 855 F.2d 987, 994 (2d Cir.1988).

not meet the definition of interestedness under the 1940 Act, the omitted information is immaterial as a matter of law. Second, the defendants argue that disclosure of the omitted information was not required because, when viewed in the context of the totality of information regarding Grillos's relationship to eVineyard, the omitted information does not bear materially on Gerhard's and Hughes's independence. These arguments are untenable.

With respect to the first argument, the defendants' obligation to disclose information that materially bears on Gerhard's and Hughes's qualifications to serve as disinterested directors of the Fund does not turn on some legal conclusion about their status under SEC rules and regulations. SEC publications in the area reinforce this point. On October 19, 1999, the SEC in a release titled "Interpretive Matters Concerning Independent Directors of Investment Companies" [14] stressed the importance of the independent directors' role as "watchdogs" in investment companies. It concluded by issuing interpretive guidance concerning the situations under which a director would be deemed "interested" and therefore "not independent," as follows (bracketed material added):

> The staff believes that a fund director [i.e., Gerhard] who serves as a chief executive officer of any company [eVineyard] for which the chief executive officer of the fund's advisor [Grillos] serves as a director also may be treated as "interested." The relationship between the fund director and the adviser's chief executive officer may tend to impair the director's independence because the adviser's chief executive officer has the power to vote on matters that affect the director's compensation and status as chief executive officer of the company. In this instance, the fund director may

act with respect to fund matters in a manner to preserve his or her relationship with the company and with the adviser's chief executive officer, rather than in the interest of the fund's shareholders.

The need to disclose relationships of this kind was reiterated by the SEC when it promulgated a new Item 22 to Schedule 14A to provide for a minimum threshold of disclosure obligations in proxy materials relating to the election of fund directors:

> (b) *Election of Directors.* If action is to be taken with respect to the election of directors of a Fund, furnish the following information in the proxy statement . . .

> (10) If an Officer of an investment advisor [Grillos] . . . of the Fund, serves, or has served since the beginning of the last two completed fiscal years of the Fund, on the board of directors of a company where a director of the Fund or nominee for election as director who is not or would not be an "interested person" of the Fund within the meaning of section 2(a)(19) of the Investment Company Act of 1940 . . . is, or was since the beginning of the last two completed fiscal years of the Fund, an officer [Gerhard and Hughes], identify:

> (i) The company;

> (ii) The individual who serves or has served as director of the company and the period of service as director;

> (iii) The investment advisor . . . where the individual . . . holds or held office and the office held; and

> (iv) The director of the Fund, nominee for election as director . . . who is or was an Officer of the company; the

---

**14.** Release No. IC–24083, 1999 SEC No–Act. LEXIS 844.

office held; and the period of holding the office.[15]

These amendments were effective as of January 31, 2002.[16] Thus, when the 2002 proxy statement was issued, disclosure of these relationships appeared necessary as a matter of federal securities law.

Even if the relationships of the defendants did not fit perfectly within the ambit of Section 14A requirements, nondisclosure of the relationships is not excused under federal law. The SEC emphasized as much when it noted that the disclosure requirements of Schedule 14A were minimum requirements and not safe harbor determinations of materiality:

> [W]e wish to emphasize that a fund's independent directors can vigilantly represent the interests of shareholders only when they are truly independent of those who operate and manage the fund. To that end, we encourage funds to examine any circumstances that could potentially impair the independence of independent directors, whether or not they fall within the scope of our disclosure requirements.[17]

Defendants further attempt to argue disclosure is not required under the 1940 Act because the SEC has not exercised its administrative powers under Section 2(a)(19) of the Act to declare either Gerhard or Hughes to be interested persons. But, the SEC had no way of knowing about Grillos's involvement with eVineyard and its possible effect on the independence of Gerhard and Hughes because the defendants never publicly disclosed any of this information. Thus, the absence of action by the SEC is both understandable and irrelevant. The SEC realized that such a problem might arise under its disclosure regime and, in its commentary to the amendments to Item 22, stated the following:

> Our amendments regarding circumstances that may raise conflict of interest concerns for directors benefit investors by enabling investors to decide for themselves whether an independent director would be an effective advocate for shareholders. Disclosure of this type of information also results in its public dissemination, bringing these circumstances to the attention of the fund shareholders, and encouraging the selection of independent directors who are independent in the spirit of the Act. Finally, this information assists the Commission in determining whether to exercise its authority under section 2(a)(19) of the Act to find that a person is an interested person of a fund by reason of having had, at any time since the beginning of the last two completed years of the fund, a material business or professional relationship with the fund and certain persons related to the fund.[18]

Finally, it must be said that a discussion of whether the supposedly independent directors were in fact independent under the 1940 Act is only of passing significance to the court's analysis. The real issue is whether the omission of the information in question violated the defendants' disclosure duties under Delaware law. In that sense, disclosure is necessary if a stockholder would have considered the information important in deciding how to vote.[19] As the foregoing discussion illustrates, the omitted information would almost certainly

---

15. 17 C.F.R. § 240.14a–101(b)(10).

16. *See* 66 F.R. 3734, *3745.

17. 66 F.R. 3734, at *3743.

18. *Id.* at *3748.

19. *Rosenblatt,* 493 A.2d at 944.

be considered important in the context of an election of directors, especially in the context of a registered investment company.

Given the chance, the Fund's stockholders could have reasonably inferred, either from Grillos's *de jure* powers at eVineyard or from his *de facto* exercise of such powers, that his roles at eVineyard gave Grillos actual or potential influence over Gerhard and/or Hughes, which influence could be viewed as affecting their judgment as independent directors of the Fund. Further, the defendants' frequent references to Gerhard and Hughes as "independent" or "disinterested" directors of the Fund strongly implies that they were free to act with complete and undivided loyalty to the Fund. The Fund's stockholders were entitled to know the omitted information in order to judge for themselves Gerhard's and Hughes's independence and disinterestedness.

■ The defendants' second argument is that, even if the omitted information tended to show a lack of director independence, a complete understanding of Grillos's relationship with eVineyard shows that the undisclosed relationships could not have interfered with or diminished Gerhard's and Hughes's ability to act independently. This argument misconstrues the legal test to be applied. "Materiality is to be assessed from the viewpoint of the 'reasonable' stockholder, not from a director's subjective perspective."[20] In other words, it does not matter whether Gerhard and Hughes each strongly held his ability to act independently of Grillos or whether the other defendants shared this view. What matters is how a reasonable stockholder would have regarded disclo-

sure of the facts relating to Grillos's relationships to eVineyard, Gerhard and Hughes. Millenco correctly argues that the facts surrounding these relationships bore on the directors' independence and, because there is a substantial likelihood a reasonable investor would have wanted to know about these facts in deciding how to vote on the elections of each of Grillos, Freudenthal, and Gerhard, needed to be disclosed in the 2001 and 2002 proxy materials.

The defendants' efforts to explain away the omitted information by pointing to additional information that softens or mitigates the impact of the omission merely reinforces the conclusion that the Fund stockholders should have been given the chance to decide for themselves how things looked. The possibility that, with the benefit of complete disclosure, the stockholders would have allowed these men to run unopposed for election can hardly justify the omission of any information at all.

In the end, the defendants cannot escape the conclusion that they should have presented their explanations about the various relationships in the proxy statements in which they solicited votes for the election of directors at the 2001 and 2002 Annual Meetings. They were free to explain why they believed that the eVineyard relationships did not have the potential to impair the independence of either Gerhard or Hughes as directors of the Fund. Had they done so, the stockholders would have been able to decide for themselves what significance to attribute to such facts and the accompanying explanations.[21] What defendants were not free to do was to take the position that the stockholders had no

20. *Arnold,* 650 A.2d at 1277.

21. *Zirn,* 621 A.2d at 779 (materiality standard "does not contemplate the subjective views of the directors, nor does it require that the

information be of such import that its revelation would cause an investor to change his vote").

right to know this information because they, the defendants, had determined it was not important.[22]

## IV.

■ In view of the court's conclusion that the election of directors at both the 2001 and 2002 Annual Meetings was procured by the use of materially false and misleading proxy materials, the appropriate remedy is to order new elections to fill the three director seats that were up for election at those meetings.[23] The record reflects that, if Millenco had been furnished with the omitted information in 2001 or 2002, it would have acted to oppose the elections. The courts of this state "have long held that inequitable conduct by directors that interferes with a fair voting process may be set aside in equity."[24] Moreover, the "right of shareholders to participate in the voting process includes the right to nominate an opposing slate."[25]

The only remaining issue is whether to order a new election in advance of the 2003 annual meeting of stockholders. The answer to that question will turn on when that meeting is or will be scheduled to be held. If the court receives assurances that such a meeting will be held within 60 days of the date of this opinion, the court will be inclined to the view that only a single meeting needs to be conducted. If not, the court will order the convening of a special meeting no later than February 15, 2003 for the purpose of electing 3 directors.

## V.

For the foregoing reasons, Millenco's motion for summary judgment is **GRANTED,** and the defendants' cross-motion for summary judgment is **DENIED.** Counsel for Millenco shall submit an order in conformity with this opinion no later than December 30, 2002, on notice.

---

22. In addition, the court notes that the defendants never discussed or considered whether disclosure of the omitted information was necessary. Surprisingly, the record shows that neither the Fund nor its counsel even distributed the normal questionnaires to officers and directors in order to ascertain the extent of each respondent's relationships with other directors, the Fund, its advisers or their affiliates.

23. *Bertoglio v. Texas International Co.,* 488 F.Supp. 630 (D.Del.1980); *Goldstein v. Lincoln Nat'l Convertible Securities Fund, Inc.,* 140 F.Supp.2d 424, 446 (E.D.Pa.2001).

24. *Linton v. Everett,* 1997 WL 441189 at *9 (Del.Ch. July 31, 1997).

25. *Id.* (also noting that "[t]o set aside the election results on the basis of inequitable manipulation of the corporate machinery, it is not required that *scienter, i.e.,* actual subjective intent to impede the voting process be shown").